UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL ASSOCIATION OF LETTER CARRIERS, AFL-CIO,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES POSTAL SERVICE,<br><br>Defendant. | Civil Action No. 19-2617 (JEB) |

**MEMORANDUM OPINION**

Defendant United States Postal Service has unilaterally reformed the duties and functions of letter carriers in the Annandale, Virginia, Post Office, requiring them to spend less time in the office and more time on the street. To boot, USPS is currently rolling out these test reforms at several hundred other post offices. Plaintiff, the National Association of Letter Carriers, AFL-CIO (NALC) — a labor union that represents postal employees — now moves for injunctive relief to block this new workplace initiative. NALC alleges that these actions constitute a breach of the parties' operative collective-bargaining agreement and several Postal Service regulations. Later this month, the parties are scheduled to arbitrate this dispute under the terms of the CBA. But the Union asks this Court to intervene now, on the ground that Defendant's reforms are currently injuring its members' physical health, damages that arbitration cannot remedy. It therefore seeks a preliminary injunction pending arbitration. Because such relief is unnecessary to protect the integrity of the arbitral process, the Court concludes that it lacks jurisdiction to grant an injunction and will deny Plaintiff's Motion and dismiss the case.

## I. Background

NALC represents city letter carriers employed by the Postal Service. See ECF No. 1 (Complaint), ¶ 1. USPS, in turn, is an independent agency of the Executive Branch, see 39 U.S.C. § 201, that provides mail services throughout the country. Id. §§ 101, 403. Of central significance here, the relationship between the Union and the Postal Service is governed by a CBA that sets forth the terms and conditions of the employment of carriers. See Compl., ¶¶ 16–28.

In particular, Article 34 lays out the procedure for testing potential changes in "work measurement systems or work or time standards." ECF No. 2 (Plaintiff's Motion for Preliminary Injunction), Exh. 2 (Exhibit A – 2016 CBA), Art. 34(B). Article 34(C) provides that when USPS "determines the need to implement any new nationally developed and nationally applicable work or time standards, it will first conduct a test or tests of the standards in one or more installations." And if a dispute arises involving the interpretation of the CBA, the parties' agreement sets out a grievance procedure that includes national-level arbitration. Id., Arts. 15, 34(D), 34(E).

The conflict here centers around the Postal Service's Consolidated Casing Initiative (CCI), which is meant to streamline its operations. See Compl., ¶¶ 29–63. Ordinarily, a carrier's daily duties include both office time and street time. Id., ¶¶ 11–12. While at the office, a letter carrier "cases" the mail for his route and performs other related work. Id., ¶ 12. More specifically, "[c]asing mail involves sorting mail by address, by placing the pieces of mail for the delivery route into . . . a cabinet-like structure." Id. After doing so, the letter carrier spends the rest of his shift delivering the mail on a designated delivery route. Id., ¶ 13.

According to Defendant, this model of doing business is outdated and has created operational inefficiencies, inflated costs, and reduced workspace. See ECF No. 11 (Defendant's Motion to Dismiss) at 7–8. To address these concerns, it developed an initiative to test

2

restructured carrier assignments.  Id. at 8; see also Compl., ¶¶ 29–30, 35.  The test consists of assigning some carriers exclusively office duties — *i.e.*, casing — and others exclusively street duties — *i.e.*, mail delivery.  Id., ¶¶ 29–30.  In a letter dated March 21, 2019, Defendant notified the Union that the Annandale, Virginia, Post Office would serve as the first "test site." Id., ¶ 30.  The Postal Service also asserted that its initiative complied with Article 34 of the CBA.  Id., ¶ 29.

On April 24, NALC responded by initiating a national-level grievance, alleging that the Service's actions violated the CBA.  Id., ¶ 31.  It further explained that the initiative was not authorized by Article 34 and breached other provisions of the CBA and Postal Service regulations.  Id., ¶¶ 31, 44–51.  Undeterred, USPS pushed forward, and less than a month later, it reconfigured the Annandale carriers' work assignments.  Id., ¶ 34.

This reform, the Union argues, has taken a heavy toll on some of its Annandale members. Id., ¶¶ 35–37, 39–43.  Those assigned exclusively to street duty are working longer hours delivering mail and carrying heavier satchels.  See Pl. PI Mot. at 8.  And as they begin work about an hour later each day, they are "more . . . exposed to the heat of the long summer afternoons," deliver into the night hours in the fall and winter, and no longer can "run necessary personal errands before offices and businesses close."  Id. at 8–9.  Shouldering this burden has resulted in "physical exhaustion, ailments, pain and mental stress."  Id. at 8.  So far, the Postal Service has introduced its initiative at seven other sites, but it will increase that number to over 240, which expansion NALC also challenges.  See ECF No. 16 (Plaintiff's Opposition) at 1.

At an impasse, the parties initially agreed to arbitrate their dispute on December 18, 2019, see ECF No. 21 (Arbitration Notice) at 2, and they have recently agreed to move up the date to November 22.  Id.  Meanwhile, on August 29, the Union filed both a Complaint and a

3

Motion for a Preliminary Injunction in this Court. In each filing, Plaintiff has sought to enjoin the Postal Service from proceeding with its initiative pending arbitration. See Compl. at 12 (Prayer for Relief); Pl. PI Mot. at 18. Defendant, in turn, moves to dismiss the Complaint for lack of jurisdiction.

## II.  Legal Standard

The Union's Complaint and its Motion are coterminous, as they both raise exactly the same issue — whether the Court can enjoin the Postal Service from carrying out its initiative before the late-November arbitration. See Compl. at 12 (Prayer for Relief); id., ¶¶ 58–63; Pl. PI Mot. at 10–18. In other words, the Complaint seeks no relief beyond the Motion; as NALC's filings thus rise and fall together, the Court need not address them separately. The Court, consequently, addresses only Defendant's Motion to Dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure. See Def. MTD at 1, 11.

In considering such Motion, the Court must "treat the complaint's factual allegations as true and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (citation omitted) (quoting Schuler v. United States, 617 F. 2d 605, 608 (D.C. Cir. 1979)). The Court need not accept as true, however, "a legal conclusion couched as a factual allegation," nor an inference "unsupported by the facts set out in the complaint." Trudeau v. FTC, 456 F.3d 178, 193 (D.C. Cir 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)).

Under Rule 12(b)(1), a plaintiff bears the burden of proving that the Court has subject-matter jurisdiction to hear his claims. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992). A court also has an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority." Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001). As such, "'the plaintiff's factual allegations in the complaint . . . will

4

bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim." Id. at 13–14 (quoting 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1350 (2d ed. 1987)).

### III.    Analysis

USPS offers two arguments to support dismissal. First, it asserts that this Court lacks subject-matter jurisdiction to issue injunctive relief. See Def. MTD at 11–17; ECF No. 18 (Defendant's Reply) at 1–6. Second, even if jurisdiction exists, Defendant contends that the Union has not carried its heavy burden to show that it is entitled to a preliminary injunction. See Def. MTD at 17–23; Def. Reply at 6–10. The Court's analysis begins and ends with jurisdiction, which does not exist here. It will first set out the legal framework governing this type of challenge in labor-law disputes and then apply it to the facts at hand.

####    A.    Legal Framework

As a starting point, the Norris-LaGuardia Act generally withdrew the federal courts' jurisdiction to enter injunctions in labor disputes. See 29 U.S.C. §§ 101, *et seq*. The NLGA, in relevant part, provides:

> No court of the United States . . . shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of this chapter; nor shall any such . . . order . . . be issued contrary to the public policy declared in this chapter.

Id. § 101 (emphasis added).

After the passage of the NLGA, however, Congress enacted the Labor-Management Relations Act (LMRA), which granted federal courts jurisdiction over suits alleging breach of collective-bargaining contracts. See 29 U.S.C. § 185(a). The LMRA also became "the vehicle for enforcing the fundamental federal labor policy favoring recourse to private arbitration."

5

Niagara Hooker Emps. Union v. Occidental Chem. Corp., 935 F.2d 1370, 1375 (2d Cir. 1991) (citing Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 455 (1957)).  In effect, the Act "both encourages arbitration and affords the party to a collective bargaining contract the benefit of its bargain." Id. at 1376.  These twin policies, however, created "some tension" with the NLGA's general anti-injunction provisions.  See Verizon New England, Inc. v. Int'l Broth. of Elec. Workers, Local No. 2322, 651 F.3d 176, 183 (1st Cir. 2011).

To accommodate these competing mandates, the Supreme Court carved out a "narrow" exception to the NLGA's proscription against enjoining labor disputes where an injunction is necessary to protect the integrity of the arbitration.  See Boys Markets, Inc. v. Retail Clerks Union, Local 770, 398 U.S. 235, 238, 253–55 (1970) (upholding order enjoining strike pending resolution of arbitrable dispute through grievance process in collective-bargaining agreement); see also Indep. Oil & Chemical Workers of Quincy, Inc. v. Proctor & Gamble Mfg. Co., 864 F.2d 927, 930 (1st Cir. 1988) ("[T]o preserve the framework of collective bargaining, parties are sometimes thrown back to the courts.") (citing Boys Markets, 398 U.S. at 249–53).  Six years later, the Court emphasized the narrow application of the Boys Markets exception, concluding that the justification for such an injunction is not to remedy a breach of the collective-bargaining agreement, but rather to hold the parties to their agreement to arbitrate.  See Buffalo Forge Co. v. United Steelworkers of Am., 428 U.S. 397, 407–09 (1976) ("[A]side from the enforcement of the arbitration provisions of such contracts, within the limits permitted by Boys Markets, the Court has never indicated that the courts may enjoin actual or threatened contract violations despite the [NLGA].").

Although Boys Markets and Buffalo Forge both arose in the context of an employer's seeking to enjoin a union from undermining arbitration, courts have applied these principles in

6

the reverse situation — that is, when a <u>union</u> seeks an injunction against the employer. See, e.g., Niagara Hooker, 935 F.2d at 1377; Local Lodge No. 1266 v. Panoramic Corp., 668 F.2d 276, 277, 283 (7th Cir. 1981); Lever Bros. Co. v. Int'l Chem. Workers Union, Local 217, 554 F.2d 115, 123 (4th Cir. 1976) ("Further, the rule contained in this case is obviously a two-sided coin. An injunction to preserve the status quo pending arbitration may be issued either against a company or against a union in an appropriate Boys Markets case . . . .").

Typically, to obtain injunctive relief, a plaintiff must convince a court that the traditional requirements of equity — probability of success on the merits, irreparable injury, a balance of hardships, and the public interest — support the award. See Panoramic, 668 F.2d at 283. But where, as here, a court faces a request for a Boys Markets preliminary injunction, it must first account for the jurisdictional limitations set out by the NLGA. See, e.g., Columbia Local, Am. Postal Workers Union v. Bolger, 621 F.2d 615, 617 (4th Cir. 1980). Either way, a court "must avoid reaching the merits of arbitrable disputes." Drivers, Chauffeurs, Warehousemen & Helpers, Teamsters Local Union No. 71 v. Akers Motor Lines, 582 F.2d 1336, 1342 (4th Cir. 1978).

When a court is deciding whether to issue an injunction against an employer, its focus must be on preserving the arbitration process. See Niagara Hooker, 935 F.2d at 1377 (finding that unilateral implementation of random drug testing challenged in grievance arbitration not subject to injunction). To grant such relief under the Boys Markets exception, therefore, a court begins by determining whether the underlying dispute is "subject to mandatory arbitration under the labor contract." Id. "If not, no Norris-LaGuardia problem arises." Indep. Oil, 864 F.2d at 930. But if so, the court may interfere only when an injunction is "necessary to 'prevent

7

arbitration from being rendered a meaningless ritual.'" Niagara Hooker, 935 F.2d at 1377 (quoting Panoramic, 668 F.2d at 283).

To put a finer point on it, "[t]he arbitration process is rendered meaningless only if any arbitral award in favor of the union would substantially fail to undo the harm occasioned by the lack of a status quo injunction." Id. at 1378; see also Panoramic, 668 F.2d at 282 (explaining that courts inquire whether "employer's action frustrates the arbitral process or deprives the union of an otherwise effective arbitral remedy") (emphasis added). Consider, for example, the Fourth Circuit's decision to uphold an injunction that prevented a company from moving its entire operations out of state until arbitration could occur. See Lever Bros., 554 F.2d at 122. Without injunctive relief there, the relocation of the operations would have been a *fait accompli*: even if the arbitrator had ruled in favor of the union, there would have been no reasonable means for him to have ensured the resurrection of the original plant, and the employees "would have been totally and permanently deprived of their employment." Id.; see also William T. Payne, Enjoining Employers Pending Arbitration—From *M-K-T* to *Greyhound* and Beyond, 3 Ind. Rel. L.J. 169, 178–79 (1979) ("[I]t is unlikely that the arbitrator [would] order the employer to dismantle its new operations and reopen the old plant. Such a remedy would be viewed as 'economic waste,' or as having the effect of unjustifiably forcing the employer to 'unscramble the omelet.'"). As such, the arbitral process would have been "a hollow formality." Lever Bros., 554 F.2d at 123; see also Columbia Typographical Union, No. 101 v. Evening Star Newspaper Co., 1978 WL 1740, at *2 (D.D.C. Dec. 31, 1978) (enjoining employer who threatened to shut down operation rather than submit to arbitration).

The arbitral process, however, is "not rendered 'meaningless[]' . . . by the inability of an arbitrator to completely restore the status quo ante or by the existence of some interim damage

that is irremediable." Niagara Hooker, 935 F.2d at 1378; see United Rubber Workers v. Bridgestone/Firestone, Inc., 61 F.3d 1347, 1354 (8th Cir. 1995) ("The fact that the arbitration decision will not be able to restore perfectly the status quo ante is not enough; the injury must be irreparable and must 'threaten the integrity of the arbitration process itself.'") (quoting Niagara Hooker, 935 F.2d at 1377). Indeed, mere incidental harms that occur during the pendency of the arbitration do not frustrate the arbitration process, even if an arbitrator is unable to remedy them. See Panoramic, 668 F.2d at 285 n.12 ("While awaiting a decision by an arbitrator on his grievance, an employee frequently suffers some injury that is not compensated by the contract remedies (in contrast to tort damages) typically awarded in arbitration. Although such injury is, in this sense, irreparable, it has never been understood to form the basis for injunctive relief against the employer.") (citation omitted) (citing Payne, *supra*, at 198–200). Instead, "the irremediable injury in question must be such as to threaten the integrity of the arbitration process itself." Niagara Hooker, 935 F.2d at 1378 (emphasis added); see also Am. Postal Workers Union v. U.S. Postal Serv., 372 F. Supp. 2d 83, 91 (D.D.C. 2005) ("Thus, '[a]n injunction in aid of arbitration is appropriate . . . only when the actual or threatened harm to the aggrieved party amounts to a frustration or vitiation of arbitration.'") (quoting Panoramic, 668 F.2d at 286).

With that legal backdrop, the Court now proceeds to an analysis of the facts presented here.

B. Application

At the outset, the Court concludes that the contractual dispute here — *viz.*, whether the Postal Service's roll-out of its CCI violates the CBA — is arbitrable. See Indep. Oil, 864 F.2d at 930. Neither party disputes this point, and binding arbitration is scheduled to begin later this month. See Arbitration Notice at 2.

9

So the Court now moves on to the more nettlesome inquiry: whether injunctive relief is necessary to preserve the arbitral process. See Niagara Hooker, 935 F.2d at 1377. In arguing the affirmative, NALC posits that if an arbitrator finds that USPS violated the CBA, he cannot fashion a remedy that would completely compensate the letter carriers. See ECF No. 15 (Plaintiff's Reply) at 13–17. In other words, while the arbitrator could rescind the CCI, he could not make whole the members who suffered under the test regime.

To begin, NALC does not contest that an arbitrator can remedy its members' economic harms. See ECF No. 23 (Hearing Transcript) at 12. The parties, not surprisingly, disagree on whether Defendant's initiative is even responsible for such harm. NALC, for example, maintains that the reform has led to increased hours and overtime for street carriers. See Pl. PI Mot. at 8. The Annandale Postmaster rejoins that the increase in overtime is not due to the initiative itself, but rather to staffing issues. See Def. MTD, Exh. 4 (Declaration of Barbara Gauthier), ¶ 10. The Postal Service also points out that most overtime is voluntary and that several of the "declarants who complain about extended hours had actually signed up for additional overtime." Def. MTD at 21 n.4 (citing Gauthier Decl., ¶¶ 11–12). The Union also notes that six carriers at the Annandale office have retired, resigned, or transferred to another station. See Pl. Opp. at 13. In response, Defendant points out that the Union offered evidence of only one carrier who stated that the initiative directly influenced her retirement plans. See Def. Reply at 6 n.4.

The Court, however, need not wade into these waters. Even assuming NALC is correct about the source of its members' harms, if the Union were to prevail in arbitration, an arbitrator could award backpay and damages to the street carriers for their economic injuries. See Union Food and Commercial Workers Union v. Kroger Co., 778 F.2d 1171, 1176 (6th Cir. 1985); F. Elkouri & Elkouri, How Arbitration Works, Ch. 18 15–22 (8th ed. 2016) (explaining that

10

arbitrators can order reinstatement, full back pay, front pay, and benefits); see also Davis v. Pension Benefit Guar. Corp., 571 F.3d 1288, 1295 (D.C. Cir. 2009) (noting that general rule in this Circuit is "that economic harm does not constitute irreparable injury"). Under these circumstances, the arbitration process would not be rendered a "hollow formality." Niagara Hooker, 935 F.2d at 1379.

The bigger issue here, however, is the alleged non-economic injuries — *i.e.*, the physical toll from increased pavement pounding. See Pl. PI Mot. at 8–10; 14–16; Hearing Transcript at 12. For example, NALC contends that Annandale's street carriers are now spending more time handling heavier satchels and are thus "experiencing physical exhaustion, ailments, pain and mental stress." Pl. PI Mot. at 8–9. One carrier, for example, "suffered a groin strain," while "another had to see a doctor for a foot ailment." Id. at 9; see also Hearing Transcript at 9, 35 (Plaintiff alleges that initiative is causing one carrier to take 200 mg of Motrin twice daily).

Compounding matters, the Union says, is the Postal Service's decision to set a later start time for its street carriers. See Pl. PI Mot. at 9. Plaintiff maintains that this delay will create inconveniences both during and outside of working hours. During the workday, NALC asserts that its members will be more exposed to the heat of summer afternoons and will have fewer daylight hours to deliver mail in the fall and winter. Id. Outside of working hours, some carriers have complained that a later end time makes it difficult for them to pick up their children after school, attend to family matters, and run errands. Id. NALC further asserts that its members now face "more exhausting and stressful days" because the change in schedule affects their daily commute. Id. These harms are expected to proliferate as USPS introduces its initiative at over 240 sites. Id. at 1–2.

11

The Postal Service, for its part, has offered two contradictory responses to the Union's position. In initial briefing and at the hearing, its counsel insisted that an arbitrator <u>could</u> remedy these non-economic harms and that an injunction was thus unnecessary. See Hearing Transcript at 23–24 ("But the arbitrator has complete control and power to remedy any situation including the economic harm and the non-economic harm" that the letter carriers said they were suffering.); id. at 30 (arguing that there is "no bar on the arbitrator saying that I find that there is a sort of pain and suffering element for which I would like to compensate these carriers"); Def. Reply at 5 ("[T]o the extent such normal incidents of work life as fatigue, minor discomfort, or inconvenience due to working slightly longer hours or delivering mail (in lieu of office work) require a remedy, the arbitrator has authority to order it."). The Court, consequently, ordered supplemental briefing so that USPS could cite some authority for this position.

Now, in that briefing, the Postal Service, in an about-face, concedes that an arbitrator <u>cannot</u> remedy these non-economic harms. See ECF No. 20 (Defendant's Supplemental Memorandum) at 1–7. Instead, it posits that these injuries are insufficiently serious such that an absence of remedy would not frustrate the arbitral process. Id. at 2–7. Although *volte-faces* like this hardly constitute optimal litigation practices, the Court ultimately agrees with the latter position.

For starters, Defendant's actions do not "deprive[] the union of an otherwise effective <u>arbitral</u> remedy." Panoramic, 668 F.2d at 282 (emphasis added). Here, at bottom, the purpose of the arbitration is to resolve a breach-of-contract allegation — namely, whether USPS's initiative violates, *inter alia*, Article 34 of the CBA. There is no doubt that the arbitrator will hear the dispute this month and likely adjudicate it by early next year. He indeed may determine that this reform violates the contract and may order the test discontinued. He also may order the Postal

Service to restore the *status quo ante* — that is, direct Defendant to return the carriers to both casing and street-delivery duties. On that basis, the arbitration process would fulfill its intended purpose. Under that scenario, the Union's success would be more than an "empty victory." Bhd. of Locomotive Eng'rs v. Mo.-Kan.-Tex. R.R. Co., 363 U.S. 528, 534 (1960).

Additionally, commentators have noted that "very few employer actions would frustrate arbitration in the sense of rendering it a nullity." Norman L. Cantor, *Buffalo Forge* and Injunctions Against Employer Breaches of Collective Bargaining Agreements, 1980 Wis. L. Rev. 247, 283; see id. ("Courts have been most prone to find irreparable injury in this context when an employer's prospective action involves multiple job loss."); Payne, *supra*, at 203 ("Other than plant relocations and shut-downs which cause permanent job loss, there are probably no employer changes which threaten to cause irreparable harm that will affect the arbitral process."). They have nevertheless acknowledged that, under certain circumstances, "the refusal to grant an injunction is clearly inequitable even though the potential harm does not threaten arbitration." Payne, *supra*, at 203. For example, courts may intervene when a work change gives rise to "serious safety claims." Cantor, *supra*, at 286; see Payne, *supra*, at 203 ("[S]urely the case for granting an injunction when lives are at stake is as compelling as for when jobs are at stake.").

This was the case in United Steelworkers of Am. v. Blaw-Knox Foundry & Mill Mach., Inc., 319 F. Supp. 636 (W.D. Pa. 1970), where the court enjoined a metal foundry's unilateral implementation of a policy reducing the number of workers staffed to operate an open-heath furnace. Id. at 640–42. It found that a crew reduction presented a risk of serious and irreparable physical injury because they might not be able to contain molten steel seeping from the furnace. Id. But the facts here are different in kind. The Court is not unsympathetic to the plight of the

13

letter carriers in this case, but their physical ailments are a far cry from the severe safety risks in United Steelworkers.

Similarly, NALC's other allegations of irremediable harms do not merit judicial intervention. In Bolger, the Fourth Circuit held that the district court improperly enjoined the Postal Service from proceeding with its plan to eliminate a work shift and transfer employees into new positions within the same Post Office. See 621 F.2d at 616–17. The appellate court concluded that USPS's actions did not frustrate the arbitral process because the harms that would take place during the pendency of arbitration, including "reporting time, days off, vacation time and other convenience factors," did not render the arbitration an empty victory. Id. at 618. This much is true here.

The Court acknowledges that the caselaw is sparse and that some cases have gone the other way. See, e.g., Oakland Local, Postal Workers Union v. U.S. Postal Serv., 1981 WL 2383, at *2 (N.D. Cal. Feb. 11, 1981) (holding that removal of rest stools used by mail carriers merited *status quo* injunction prior to arbitration); Nat'l Ass'n of Letter Carriers, AFL-CIO v. U.S. Postal Serv., 1975 WL 12022, at *1 (S.D. Iowa Feb. 5, 1975) (holding that eliminating ten-minute "wash up time" for carriers "clearly" caused irreparable harm because *status quo* could not be restored afterwards). But their logic runs afoul of the NLGA's anti-injunction provisions and does not fit within the Supreme Court's narrow exception to this proscription. See, e.g., Payne, *supra*, at 180 (casting doubt on whether alleged harm in U.S. Postal Serv., 1975 WL 12022, was "so irreparable" that it interfered with arbitral process). In the end, the fact that the arbitral process does not provide every conceivable category of remedy does not render it hollow or meaningless. See Niagara Hooker, 935 F.2d at 1378; Panoramic, 668 F.2d at 285 n.12; see also Indep. Oil, 864 F.2d at 932 ("Dislocations invariably attend any modification in working

14

conditions. If disruption of workers' lives and habits was deemed sufficient harm on which to bottom injunctive relief, then the exception would swallow the rule, and the courts would be mired hip-deep in matters which Congress intended to remit to an arbitral forum.").

In short, because injunctive relief is unnecessary to preserve the arbitral process, see Niagara Hooker, 935 F.2d at 1378, the Court concludes that it lacks the jurisdiction to grant such relief in this case.

## IV. Conclusion

For these reasons, the Court will grant Defendant's Motion to Dismiss and will deny Plaintiff's Motion for a Preliminary Injunction. A separate Order consistent with this Opinion will be issued this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date: November 6, 2019